20-2145. And we are ready for argument. Ms. West, when you're ready, please proceed. Good morning. May it please the Court, my name is Christina West. I'm representing the appellate to Pueblo of Jemez. And on behalf of the Jemez leaders and members here today, we'd like to thank you for traveling to come to hear these oral arguments. I will reserve two minutes of my time for rebuttal. In his 2015 opinion, in Jemez 1, this Court discussed at length well-established law of aboriginal title. To quote the Court, quote, the government's nature of aboriginal title in the last 200 years of Supreme Court jurisprudence. End quote. Despite this Court's affirmation of settled law, the trial court wrongly misread Jemez 1 to alter centuries of Supreme Court precedent. The trial court erred when it created a new law and new standards to deny Jemez title to two sub-areas, Banco Benito and the Pueblo. In this analysis of Banco Benito, the trial court wrongly felt compelled to create a new retention test based on two words in the Jemez 1 opinion. Those two words were, and I quote, and thereafter, which appeared in the following sentence. Quote, when Jemez Pueblo can establish that it exercised its right of aboriginal occupancy to these lands in 1860 and thereafter, is a fact question to be established on remand. End quote. Although finding that Jemez established title to Banco Benito as of 1650 and that the government failed to prove abandonment or extinguishment, the trial court incorrectly shifted the burden back on Jemez to prove that Jemez excluded other hypothetical tribes and affirmatively disproved that other tribes did not have occasional wanderings. Counsel, can I stop you there and just ask you, can you tell me what you interpret the words in thereafter to mean? I do not think it can mean what the district court said, which is that this court intended to create a new test for aboriginal title. What I believe is that and thereafter should be read in the context of the Jemez 1 opinion in the section that was discussing and analyzing the Baca's cloud and whether the Baca's title could cloud and basically the burden on the government to show extinguishment. So I think and thereafter was intended to be a reference to the government's burden to prove extinguishment or what about the sentence that came right after that? We said 1860 and thereafter, but then we specifically indicated how you were to prove aboriginal occupancy and we said it was by showing actual exclusive and continuous use and occupancy for a long time. So we were very clear after 1860 and thereafter, actual exclusive and continuous use. I'm struggling to understand how that didn't mean that you need to establish, you're going to have to establish exclusive use up until the time your cause of action arose, which you say was 2000. I think that creates a new law because it basically then is requiring Jemez to prove titles every single day of existence. And the argument that, first of all, the 2000 argument that Jemez had that burden to establish it as of that date was never a finding by the trial court. It was first raised by the government on appeal and never argued before the district court. So I'd say that was also a new concept that was brought up on appeal. And I think that the problem with that is that it contradicts years of law which found that a tribe, once it established title at a fixed point in time, then the burden shifted on the government. It would just be like, to me, any other property law case in which you get a deed and you have a deed and then the burden... Isn't the question though, you filed a quiet title action here and you have to establish that you have aboriginal title in this quiet title action. So don't you have to establish aboriginal title as of the point at which you filed the action or your cause of action arose, which is in 2000? Isn't that the way the case law sees it? It's at the point that you're making the determination, the court is making the determination here in 2000, do you have aboriginal title on a property? And in order for us to establish that, you must establish exclusive use. I think obviously Hamas has to continue to hold the title. Let me clarify, because I want to say, I think one reason I think we may have gotten to this point is the district court did make a finding that you had aboriginal title back in 1650, correct? Correct. At least to Banco Benito. But the district court didn't need to make that finding. The question for the district court was, do you have aboriginal title such that you can quiet title, you weren't just seeking quiet title to Banco Benito, but to the entire preserve area, do you have aboriginal title in 2000? And the court also found that Hamas uses continued and that those uses haven't been abandoned. I didn't understand that was in question. The continuous use is not in question or no one's challenging that. I mean, isn't the issue for us and for the district court exclusivity? I would agree, which I believe is the burden of the government has been held by years of precedence, as this court knows, and has cited to multiple times. We think the court was wrong for three reasons, and we've discussed some of them, but it misreads Hamas I, it contradicts past precedent, and it conflicts with property law principles. If you look at the section, again, reading the language that appears where the dispute provision is, the court was discussing whether the braggart caught it or interfered with Hamas's title. And so, again, it was talking about the government, and it discussed that at length, and it was focusing on the government's burden of extinguishment throughout that section. And that was the focus. And I think if this court intended to create this additional standard, that it would have cited to that test in its recent case in Abuselman in 2022. But no mention was made of this time that had to be established at the time of filing. And secondly, it's the burden shifting that I think is truly concerning, because as years of litigation, we have had a second sentence have the burden to establish title through long and continuous use, but then the burden shifts to the government to show extinguishment or abandonment. As far as the district court goes, the district court was not enthusiastic about that outcome. The district court felt compelled by this language to reach that outcome. Is that right? That's absolutely correct. In fact, I mean, the court said itself that if it were writing on a clean slate, it would not have required the tribe to make this. And so if we read this language the way that you're suggesting, and contrary to how the district court read the language, where would that leave us? Would it remand simply on Fanco Benito? I do not think the court would have to remand the issue, because the court did find that title had been And so there would be no other findings that the court would need to make as to Fanco Benito. So your position is, if I'm understanding correctly, that the language of Jemez One somehow indicates that if you proved that you had aboriginal title in 1650, regardless of exclusivity for the next 350 years, up until 2000, regardless of, it makes no difference to your continuing aboriginal title. Once you've established it in 1650, and we're talking about Fanco Benito here, have you given up on the entire preserve? Because that's what your complaint sought, and that's what the trial was about. But I think we're talking about Fanco Benito right now. Correct. We're sinking Fanco Benito in the sand. And I think you're relying on the district court's finding that I'm not sure it was asked to make, which was that in 1650 you had aboriginal title to Fanco Benito. That was the date the court used when he established his title. And your position is that the case law would say that because the court here said that you appeared to have aboriginal title in 1650, that you, regardless of exclusivity, for 350 years, you maintained that title in 2000. Is that your position? I wouldn't say regardless of exclusivity. I mean, I would say... Have you maintained exclusivity for 350 years to Fanco Benito? I mean, I'm sorry. I was thinking you were talking about extinguishment. Yes, I would say it continues. No, I'm talking about exclusivity. Then yes, I would say that Jemez does not have a continuing burden to reestablish his title. But your argument is you have exclusivity because you had it in 1650. Correct. And what case law supports that concept? I think there are essentially every case that discusses aboriginal title and discusses the standard in which to establish title, which is that second sentence of the court, which is long, continuous use and occupancy of the land for a long time. But the question really is at what point do you determine aboriginal title? And here, because you filed a quiet title action, we're determining it as of 2000. And it's your burden to show that you had aboriginal title as far as exclusivity and continuous and actual use. To me, I see it as if Jemez had gotten a deed in 1650, it wouldn't have to go out and get a new deed every day. Could it still lose its title? Absolutely. But this isn't the same. We're talking about aboriginal title here, so we can't compare that to getting a deed. I don't think courts have said that, you know, courts, I think every ICC court has had to establish a time period in which title was established. Courts often look at, you know, in 1600, the Sac and Fox case was discussing at length, you know, when was the title established. And that court didn't necessarily find, you know, that it had to be at a later date of time. It's not that, and I wouldn't say it's not that Jemez couldn't lose its title through extinguishment or a showing of abandonment, but that burden is on the government. Counsel, can I just stop you there to reiterate that? So your position is it's not that exclusivity is irrelevant, it's that that is part of the government's burden to show they can talk about exclusivity with regard to abandonment or extinguishment. Absolutely. That is our position, and we think other courts, like Wichita, did exactly that. In the Wichita case, the court discussed other tribes coming in and what was the effect, and the property shrank down, but absolutely, that is correct. In the Wichita case, that was a federal circuit court case, is that right? But in that case, there wasn't exclusivity, at least to some large part of the land, because tribes had continuously wandered over. That is correct. The tribe did lose to other tribes. And that's what we have here as well. Tribes have continuously wandered over Banco Benito. I would disagree that trial court specifically found that Jemez had established title, that there was no specific evidence that Zio wandered over the area. No other tribe occupied or farmed the Banco Benito. I think the court said it was something more than a fleeting transgression and something less than continuous wanderings, which is what the standard is. That's sufficient to prove non-exclusivity. But the point being is that the court then shifted the burden on Jemez to basically disprove that other tribes, and he said hypothetical tribes, because there was no direct evidence of any other tribe using it, wandered, and he was wrong to shift that burden. And I see, just very briefly, I've only got about a minute left. We're going to be a little liberal on the time clock today. Let me follow up with what Judge Moritz asked as far as, what's at issue? You're not challenging on appeal the entire Baloch culture. All we're talking about is Banco Benito and the other subparts. Correct, just the shrine lands. We feel that the trial court made similar mistakes regarding the paramount shrine lands. The district court wrongly threw out the claim on a procedural issue and wrongly held that the shrine lands were too small and that Jemez had to control not only the shrine lands but in areas surrounding the shrine lands. As to the procedural issue, we don't believe the government was prejudiced in any way by any lack of notice because the district court offered to reopen the trial to accept additional evidence, and the government declined. Let's back up a little bit. First of all, are you conceding that there was a lack of notice to the government? Because I didn't understand from your briefing. Absolutely not. Tell me where you provided notice at any point prior to your motion for rehearing post-trial that you were seeking quiet title to the paramount shrine lands. The complaint itself contained detailed descriptions of the shrine lands and the trials. But the complaint over and over and over again indicates you're seeking title to the entire preserve, essentially. In our request for relief, we make a complaint to the entire. Where in the complaint do you make it clear that you're seeking specific title to the various sub-areas of the paramount shrine land? I don't believe that Rule 8, which is a general notice pleading requirement, requires that in your request for relief you have to assert every single possible sub-area that you would accept for relief. That would be virtually an impossible standard to do prior to discovery, to have to claim each and every alternative relief that you would seek. And it would cause parties to have to constantly ask to amend the pleadings during discovery and even during trial. What about the summary judgment motion? Because in your summary judgment motion, you did mention Banco Benito, and so the court assumed that at least you must have been focusing on that particular sub-area. But in the summary judgment motion, you sought summary judgment on the entire Redondo Mountain, not the paramount shrine lands. Correct. So that would be, you know, the measure of summary judgment is another way. But in terms of the shrine lands, we also feel our discovery in particular, you know, mapped out in detail. The shrine lands, there were dozens of heinous witnesses, but I don't want to get too into the details. I understand the evidence covered many, many, many, many sub-areas. But I'm trying to understand where the government had noticed, because that you were not still seeking, as your claim for relief indicated, the entire preserve, to quiet title, to the entire preserve, which was how they proceeded at trial. I think the complaint, like many complaints, did seek, you know, the entire Valles Caldera, but it also sought, you know, judgment as is appropriately deemed by this court, which is the purpose of Rule 54C, which allows courts to conform the evidence, I'm sorry, to conform the judgment to the evidence. So even if this court felt that we did not properly plead, for two reasons, we would still appropriate judgment for sub-areas still appropriate because of Rule 54C. Well, let's back up, because I'm not to Rule 54C. What about discovery responses? That's another opportunity. There was lots of discovery in this case, and there was a specific interrogatory question asking you to describe the area within the preserve for which you seek, for which the Pueblo asserts aboriginal title. Your response was to simply describe the entire preserve. That is not correct. In our answers to discovery, which were amended several times, but I believe is in our appendix, we gave detailed descriptions of sub-areas. In response to this question, which asked what you were seeking to quiet title to, which is the question? To be honest, I don't know. I know in discovery, clearly, because we attached it, you know, discussed it in our motion for reconsideration, so I know it is referenced in there. Because that's a specific question. What exactly within the preserve are you seeking title to? The government's entitled to know before they go to trial. And your answer was simply the entire preserve. And I think, you know, and I think that's very common. You see it in many of these cases where a tribe... To a quiet title case, that's common? To not specify the specific areas that you're seeking? Well, the Quiet Title Act, you know, the U.S. has alleged that it requires pleadings with particularity. Yes, that's in the statute itself. It is, and I agree. And if you look at that subsection D of the Quiet Title Act and the cases that discuss that, it requires the claimant to describe with particularity the type of property interest both that the claimant has and the U.S. has. And the case is discussed meaning that the property interest concerns things like describe if it's a right-of-way, if it's an easement, if it's held in fee simple. And our complaint did that. It described the U.S.'s property interest, which was that it received the interest by a deed, and then it asserted that Jameis' title was through aboriginal title. But the two cases cited by the United States, actually, nothing in there says anything about having to describe subareas that was a part of your request for relief. It has to do with those two cases. It has to do with statute of limitations as well as a different subsection of the Quiet Title Act. What about in your proposed findings of fact and conclusions of law and in the trial court request that you submit proposed findings and conclusions post-trial for the court? Did you indicate in those proposed findings or conclusions that you were seeking to quiet title to the Paramount, specific areas in the Paramount Shrine area? Yes, in our findings of fact themselves, they were divided up into different subareas that we felt we had shown title to. The findings were? In our findings of fact, yes. Okay. Can you point me where in those findings that you indicated that you were seeking to quiet title to specific areas within the Paramount Shrine lands? I can, Your Honor. Maybe on rebuttal? Okay. If I can grab the... You can check on rebuttal for me. You'll have rebuttal. Okay. I'll do that when I'm done. I'm just trying to figure out if there's some spot. I'm just trying to isolate on the notice question to the government because you went through a 20-plus day trial with the government, presuming you were still seeking title to the entire preserve. And I would also say that the district court raised that question during trial at multiple points, and he asked both counsel, do you think I can award less than the whole? And the initial answer by the U.S. was yes, without any type of qualification. And then later in trial, they started saying yes, but only as to the areas sought in the motion for summary settlement. Is this on the record? It should be in the record, yes, Your Honor. And I'd just like to just briefly touch on the small lands issues. I'd just make two points with regards to that. My concern with this test that we not only have to show that we proved exclusive use and control over the Shrine Lands, but also an outside area, leads to a logical result. Because if Hamas had shown that it controlled an area surrounding those tribes, it would have shown exclusivity as to that surrounding area, and it would receive title to that area because it would control that area. So that test really doesn't make a lot of sense to me, and I also think that it conflicts with precedent in which many cases have already found that tribes are allowed to obtain title to a small area without showing the sort of additional surrounding areas test, and we cited those to the brief. But as another example in this case, I would just like to let you know the New Mexico Gas Company has an easement, which the parties have agreed to and the court has stipulated to, but there was no requirement. We didn't ask the gas company to show control of the surrounding area or put any other additional burdens because of that. And I know I've gone over my time, so unless there are any questions, I'll sit down. Thank you. Thank you. Good morning, Your Honors. I'm Mary Gilbert-Drake for the United States. Matt Marinelli, trial counsel, is here today and counsel for the New Mexico Gas Company, Kirk Allen, and Elizabeth Reitzel in the event that their pipeline easement was put into play, but as we just heard, that is not at issue here today. I would like to pick up on the issue of what notice was given about a claim to Banco Benito and to- Can we start instead with the heart of it, and thereafter, and then drift to the subsidiary- Sure. Your Honor, we think that the phrasing 1860 and thereafter meant exactly what the district court thought that it meant and that it is consistent with case law that one does have to prove aboriginal title as of the date one claims entitlement to some relief. Well, let me put it to you this way, and I guess it would be the contrary here, which is to say in the first case back in 2015, we were called upon to determine whether or not the Baca grant itself extinguished title. Correct. And that's the holding, is that it did. Correct. And then everything else goes back on remand. And among the various other things that went back on remand is stages at which the pueblo may have or may not have aboriginal title. And so as we read that opinion and we try to sort out what it means, we have to ask, which phase are we talking about? Because the Jemez could have lost at 1650. They could have lost at 1860 because the Baca heirs fenced it, or something like that. Or 1880, when the new, the next generation of Baca heirs fenced it, all the way up to the 1940s and the ICCA. Or even after that. That's how I read this opinion, and that's how I start to get into and thereafter. And thereafter, those critical words and that critical paragraph that have meant so much to the litigation, as you know better than anyone, counsel does. Those are bookended. And at the start, before that paragraph, we're talking about the government asserts that the Baca's use of the land is inconsistent with the pueblo's original title. In other words, we're talking Baca. And then right after that, we are also talking Baca. If there was actually substantial interference by others with these traditional uses before 1946 of Baca heirs, why would we not read, and thereafter, 1860, which is Baca heir time? It's an anchor in time. The reason that those numbers arise at that place in this order is not a coincidence, 1860. It's because the Baca heirs. And then it says 1860 and thereafter. Why would we not read that as pertaining exclusively to whether the Baca heirs ever did something along the way in the 80 years to follow fencing, firearms, stay off the property or something like that? Well, Your Honor, it's true that the precise issue in 2015 was extinguishment and whether the statute of limitations had barred this claim. But the court went through an exhaustive analysis of the law of aboriginal title and was giving directions on what was to happen on remand, not knowing what the specific evidence would be. I mean, obviously, at that point in time, there was no notion that 1650 would have any significance whatsoever in this case. But it is true that actual continuous exclusive use has to be shown. Those are the elements of title. In the appeal, Jemez said that its claim had not yet accrued, that its claim accrued in 2000 when the government established the preserve. So it's just fundamental principle that you have to prove the elements of title as of the date you say your claim accrued. Okay. I'm sorry. Just two follow-ups. And the first one on that point as far as – well, go ahead. You may be asking the same thing. No, no, no. All right. Don't lose your train of thought. The 1860 and the Baca errors and thereafter, if we were to disagree with you on that, and the district court felt compelled. Do you agree with that? The district court thought it was doing something that didn't make much sense but that it had to do it because of our opinion? I disagree with that, Your Honor. I think that the district court's opinion for about 698 of the 700 pages was completely in alignment with longstanding principles of aboriginal title. But you do agree that the court said if I were writing on a clean slate, it wouldn't be this. Right. There was one point about which it was expressing discomfort, and that is applying the exclusive use requirement. In a situation where there are not even hypothetical tribes, where there is absolutely no evidence that there might be other tribes out there, in that situation, does a tribe claiming aboriginal title have to show control? So I think that this district judge did an amazing job of going through all the evidence and all the law and explaining his reasoning fully, and he had that one point where he was expressing discomfort. But here, we have no hypothetical tribes. We have a commons that has been used for 800 years by 19 tribes surrounding the caldera, the only occupation of the caldera because of its environmental characteristics. It's too cold to live there in the winter. You've gotten large on me, and I want to talk Ponco Benito. And that's not really true of that. The court didn't find the same sort of wanderings or other use in that area. It did, Your Honor. You think that it's the same? It is. No, I don't believe. On the question of whether there would have to be a remand, is there some problem with the test? First of all, there was no problem with the test that the court applied. The legal standard for proving aboriginal title and exclusivity was entirely consistent with precedent, including the precedent that this court recited in Jemez 1. Whether or not you read it as part of the holding or as a discussion of the law, it's a correct discussion of the law of aboriginal title. And Ponco Benito, after 1650, not to go on at great length, but when Jemez first moved to the area of the Jemez Mountains, its villages were in the mountains closer to the preserve than the current village of Walatoa, which is 15 to 20 miles away from the preserve. In those early centuries, its villages and its surrounding farmlands extended into the very southwest corner of the preserve. So whereas we did not think it was necessary to find aboriginal title to Ponco Benito, even as of 1650, it makes sense because that was the area of villages and fieldhouses and agriculture. After that, the village moved, the population shrank, the fieldhouses were abandoned, the agriculture was abandoned. After 1650, Ponco Benito essentially was used by all tribes as a thoroughfare for passage. There were not particular unique resources on Ponco Benito. But Jemez and Zia and other tribes crossed Ponco Benito heading to Redondo Peak, which is where multiple tribes went and revere as their most sacred mountain. There are also unique resources to the west of Redondo Peak that the record well documents that tribes crossed to get those resources. And as you say, the record shows what the record shows. Last question, then I'll let someone else ask questions. If we disagree with you on those two big words, on so much hinges and thereafter, where is the United States at that point? In other words, if we say that's just talking about the Baca Errors and whether the Baca Errors interfered after 1860. Well, Your Honor, I think you need to look at the law of aboriginal title in other cases, including cases cited in that decision. The Sackin-Fox case said you don't freeze aboriginal title as of any particular date. In Wichita, the court very carefully analyzed What's the answer to my question, which is where would the United States be in this litigation if we disagreed with you on those two words and combined them to Baca? To the Baca Errors? Yes. Well, Your Honor, you can't, I mean, take that sentence out of the decision. Elsewhere in that decision, you say that it was a question on remand whether Jemez had maintained its aboriginal title. And you have to look at the body of case law. If that paragraph didn't exist, we would be exactly where we are now, which is relying on the received body of law on aboriginal title. Well, thank you. I guess to clarify, I'm not nearly as focused on the and thereafter, I guess, because what I focused on in that opinion is the five or six times that we said we are assuming right now for the sake of this motion to dismiss, which was at the early stage before any discovery about whether you even had aboriginal title. Correct. We said over and over, and specifically in a footnote, we expressed no opinion on whether on remand Jemez can establish aboriginal possession. We said it four or five more times. My understanding of what we were doing was to decide the statute of limitations issues, and that's the only reason we were talking about the Baca grant. Correct. We assumed aboriginal title had continued up until that point. The question was, assuming it continued in 1860, assuming aboriginal title, did the Baca grant extinguish it? Right. And we said no, but that was assuming. So I don't personally take that as established as important, because I think the question now is, what happened on discovery? What did the Jemez prove as far as aboriginal title? Correct. Your Honor, obviously in 2015, for that decision, this court had the complaint, and Jemez's complaint talks about its use of the Valles Caldera, and its presentation on remand is of its use. So you would not have known that the Valles Caldera is this unusual resource, this unusual landform that is significant to 19 pueblos, and some of them, Santa Clara and Zia, San Ildefonso, Cochiti, Jicarilla, who look to, not meaning to leave anyone out, look to the caldera and to the preserve with the same reverence that Jemez looks to the preserve. That all had to be developed at trial. I have a question, though. If your position is that they never had aboriginal title after 1650 to the Banco Bonito, or to any of the preserve, I presume is your position, why didn't you then post-discovery again reassert the statute of limitations question? Well, Your Honor, we thought that we needed to complete, instead of trying to get an interlocutory ruling and take an interlocutory appeal, Your Honor, we went to trial. We tried the case. It was hard fought, and so here we are. But, yes, I mean, the evidence shows that after 1650, even this is an eight square mile area on the southwestern corner of the preserve, that even that area where Jemez had its most significant Banco Bonito use, that it was not exclusive, and so that aboriginal title failed. What about the Paramount Shrine Lands, though? Right. In particular, what about the reference that was made that there was discussion during trial, and the government understood that they might be, that the Pueblo is perhaps seeking only now the Paramount, the particular areas within the Paramount Shrine Lands, which I'm not going to mention. Well, no, that actually was not ever made clear, and the district judge does a good job, I think, of setting out what happened, but even in the, so we have the complaint. In the pretrial order, there was still a claim to the Valles Caldera as a whole, and that's at volume two of the appendix at A180, and again at A187 and A273 where it's talking about the claim. We went through trial in the proposed findings of fact after trial. What happened during trial? Because I think that's an opportunity. If the evidence was, and the Jemez were presenting evidence such that it was clear, we're now focused on the Paramount Shrine Lands. Well, it was not clear, Your Honor. There was apparently some discussion during trial. That discussion was a couple sentences at the closing argument in May 2019 where the judge said, could I award less than the whole thing? Closing argument after trial. Correct, and counsel for the United States said, theoretically, but the evidence doesn't support that. It was like a one-sentence question, one question, one-sentence answer, and counsel for Jemez said, yes, you could award less, no further delineation. But that stands alone. Talking about looking at the proposed findings of fact, well, first of all, at trial, there are maps that were put into evidence by Jemez expert Dr. Ferguson that showed 90 places of cultural significance to Jemez. About 50 of these were specific places, points, and about 40 of these were called polygons, areas. But even these 90 places didn't cover the entirety of the preserve. It's not as if it was gridded out into 90 points. Why would it prejudice you to now be responding to the Paramount Shrinelands as far as whether they had aboriginal title if all of that evidence was presented about their use? So, Your Honor, I would say, standing where we are today, having had the benefit of the 2019 decision, of the 2018 decision, excuse me, 2019 and 2020 decisions, both decisions, we can look at the shrine itself. I think we can understand that the Paramount Shrinelands involve a shrine. And the district court, having reviewed all the evidence that was put in, including evidence that other tribes used the shrine, held that there was not exclusive use of the shrine. There were also three other... All kinds of sub-areas. The one that Amos identifies. By a constructed shrine with dimensions that are described. Other tribes also used it. And that is mentioned in our response brief at page 62. And where the district court pulls together the evidence is at appendix volume 6, A1034, notes 33 and 34. So, some other parts of these shrinelands are water features. And the district court made specific findings that another tribe also used these water features and rejected Jamez's proposed finding that it exclusively used these water features. Now, we didn't know until the 2020 decision that this was going to be the finding. So, at this point, standing here, were we prejudiced? Maybe not, because we managed to get in enough evidence that the district court could draw conclusions. So, then we're left with the last feature of the shrine lands, which is sometimes redacted, but not always redacted, the trails. And there was evidence that was put in, including by Jamez's expert, Dr. Fogelman, that if you look at the least cost route from Jamez to Redondo Peak and the least cost route from Zia to Redondo Peak, they join up and cross Bongo Benito in generally the same place. Now, from there up to the top of the mountain, was it precisely the same trail that both followed? We don't know. And this is where the prejudice on this point comes in. And it was a confluence of factors. So, with the confidentiality assertions of Jamez, we could not take that map and ask Zia, is this how you go? And even if we had, Zia might have said, we're not going to tell you. So, that is a possibility. But in terms of general prejudice, that's been a problem. Did you even make the effort, I guess? It sounds like maybe you would have made the effort if you could have. Yes, we did consult with other tribes in an effort to understand their use. And Zia had a witness, Jerome Lucero, Santa Clara had a witness, Michael Chavarria, that testified about their use. We also had experts. Talking about the paths now. Yes. Specifically. We had experts who put together the case. A lot of evidence came in to the case through the documentation of the Indian Claims Commission proceedings. Zia, Jamez, and Santa Ana filed a joint claim that was filed in 1951. And so, there was evidence about all of their use of this area, the southwestern part of the preserve. There was also a lot of evidence about other tribes' use admitted because of the opposition to the geothermal project in the late 70s. I guess, sorry to interrupt, but I guess what I'm trying to get at is, if you're saying that wasn't really your focus and maybe you might have been able to do more as far as the past, what if we remanded? Would you, I mean, on the Paramount Shrine issue, would you be able to then, wouldn't you be able to develop additional evidence? But I guess your argument is prejudice at that point. Maybe or maybe not. I mean, it was a 21-day trial. I mean, the judge was extremely generous in going through reconsideration and reevaluating all of that evidence. And on remand, there's, I mean, in addition to the difficulty of developing evidence at this minute level, it's like if somebody wanted to acquire a title to the University of New Mexico Law School. And, you know, so there was evidence in the case. Oh, yeah, the law school and, you know, particularly, you know, the Mood Courtroom is very important to us. And so, you know, you try to put into trial evidence to meet that. And then later, it's like, well, that seat is really important to us. You didn't put any evidence about whether you, there were other tribes using that seat or that seat. So it is prejudicial. Had there been a statement early on that at that level, there needed to be specific evidence, more effort would have been made. Now, as it turns out, a tremendous effort was made to try to address as much as possible all of those areas and places. But the target just keeps shifting. Even today, we understood the opening brief to say that the entire Valles Caldera was in play because they expressly asked for the relief of remand to reopen the trial because there should have been more evidence, oral tradition evidence entered. When we got the reply brief, it appeared, hmm, they seem to be saying they're only claiming Banco Benito and the Paramount Shrinelands. But that was a shift even from the opening brief. Just briefly, the proposed findings of fact mapped out 10 areas, which were aggregations of some of these Ferguson areas, 10 of them. And so, okay, fine, that's in the proposed findings of fact, but there was nothing there that asked the judge to make separate findings as to those areas, letting aside prejudice to the United States. And in the conclusions of law, there was no request to make separate findings. In the trial briefs, there was no request to make separate findings. So the judge understood the claim to be the whole thing, and he addressed the whole thing on reconsideration of those 10 areas. Two of them were put into play. That's Banco Benito and Redondo Meadows. The third area that was put into play on reconsideration was via San Antonio, which is an area, the northwest corner of the park. But Jemez lopped off the eastern third of their map that was in the proposed findings of fact and only sought reconsideration for the western two-thirds. We could go on like this forever. Counsel, before we do that, could I just slip in here one question that takes you back to the district court's decision? And I just want to read one line, and I just want you to tell me if you think it's correct or incorrect. So the court said, If Jemez Pueblo only had to show that it possessed aboriginal title at one point and then never abandoned the land or had extinguished the court, we'll conclude that Jemez Pueblo has established aboriginal title. Tell me, is that incorrect, what he's doing there? No, he's saying if they're right, that once you show actual exclusive and continuous use for a long time, that the case law says that you keep it unless you completely abandon it or the government extinguishes it. So if they're right on the law, then they win. But they're not right on the law, as he continues to say, because you can't freeze aboriginal title 350 years in the past. And you dispute that he based that subsequent statement on our words and thereafter. I believe he looked at the body of law. And again, the only point that he was uncertain was in a situation where the other Indians were completely hypothetical. I mean, I really think he was airing his angst on that page. But the body of the decision, as he evaluates the case law that addresses the three exceptions to the exclusive use requirement, is all correct. Understood. It's difficult to get a breaking point. And I have no doubt we could go all morning and learn much from both sides. But unless there are other questions from the panel, we'll go to rebuttal now. Thank you very much, Your Honor. The date of when a claim accrued, I feel, is different than the date of establishment. Those are two different issues. And there seems to be confusion to me of mixing these two ideas. It's our position that once title was established, Jemez did have to show that it exercises right. And the court found that its use has continued for 300 years. So it did not lose title. And that's specifically to point the court to volume six at page 1170, where the court says that Jemez had to continue to use its lands to Banco Bonito. Also, we also very much dispute that there was any other evidence that supports that any other tribe used Jemez's shrine. Counsel has cited to you one section of the court's order, which is referring to ICC testimony, in the case that involved the three pueblos that Jemez was involved in. As this court found, and as the district court found, the ICC case discerned lands outside of the Valles Caldera. That one reference to one witness in that case made a discussion about Redondo Peak generally, but I very much disagree that any Zia witness, any witness from other tribes discussed using the Jemez shrine at trial. In fact, what the court said as to at least shifting back to Banco Bonito, the court found that Banco Bonito does not have significance to Zia Pueblo, volume six at page 1011. The district court also found there's no evidence that Zia had specific trails on or near Banco Bonito, which is consistent with Jemez's concentrated occupation in the southwest corner of the Valles Caldera. And in terms of spiritual significance, the district court also found, citing to Zuni, Wichita, Alabama, Quesada, that statements of individual Indians expressing religious or spiritual interests are not enough to defeat a claim for aboriginal title. The court also specifically found the only evidence of Zia actually going to a shrine in this case was that that was separate from Redondo. And the court's findings regarding that are in appendix six at 1009, I think also 111 through 114, that found that Zia had attempted to reestablish an area after litigation and had gone and placed a marker in a different area that is not the Jemez shrine. Can I take you back to what you said at the beginning about mixing the concept of when a claim accrued? And I think I may have been inarticulate and said exactly that. What I see it as is, the question is, do you determine, you're saying that in this quiet title action that the United States is essentially attempting to extinguish your aboriginal title. So do you determine aboriginal title at the time of the alleged or asserted extinguishment, which here is 2000? Or do you determine it at some point, in this case, 350 years later, earlier? And can you point me to any case where the question of whether aboriginal title existed was decided at some time other than extinguishment? Or whatever the issue, whether it was extinguishment or quiet title action. Do you see what I'm saying? Your cause of action here is for? Yes. Is a quiet title action. And can you point me to any case where a court decided the existence of aboriginal title hundreds of years before whatever the cause of action was in that case? I think many of the ICC cases did deal with that issue of when it was established. Which one? Sac and Fox, which is actually the case. And what was the issue there? What was the issue in Sac and Fox? So Sac and Fox concerned two different tribes, making two different claims. Well, similar claims enough to bring them in that action. And there was a discussion. The main concern of the case was how compensation should be determined. Was that an ICC case? It is an ICC case. Right. Well, it's a court of federal claims. Because that's different. Because then they're trying to determine whether it arose before, right? But you still have to describe that it was established. And part of the problem, I think, in those cases that those courts have to deal with is they recognize there was, you know, history does shift facts and shift changes. So part of, you know, I think also in, I believe it was Oneida, you know, the court was concerned, well, wait, wait, we could determine extinguishment. And we haven't really figured out if the tribe has proved title. So you have to go back at some point in time to show that you had it, that you continued to use it, and that it wasn't abandoned. So I think many, and I think Wichita was another case, and it is an ICC case. But it's dealing with these changing facts of the circumstances where, yes, another tribe came in. Maybe some white settlers came in. How did that affect the tribe's continued use? And the tribes did have to show that they established it and they continued to use it. And if they didn't, then it was deemed abandoned, as was partially done in the Wichita case where other tribes came in and the court determined that the tribe had abandoned part of its claim. So I do believe, I mean, I know there was also determination of extinguishment, but they're not on the same date. You know, you didn't establish and extinguish on the same date, if that helps. I'd also like, you know, the issue was brought up about geothermal evidence. And here's this Appendix 6, I'm sorry, Volume 6, page 1036. The district court specifically found that the geothermal project evidence does not encompass Banco Bonito or the Shrine Land. So the United States has continued to cite to you, and this appendix is full of documents concerning geothermal evidence of Dr. Ellis' reports and statements made during the environmental impact statement involving tribal statements. But the court has already found that that geothermal evidence doesn't apply to Banco Bonito and the Shrine Lands. And I'd like to briefly discuss, since Zia came up, and I'm sorry, I did touch on the Shrine Lands. I would also point out that, you know, the governor, Zia, as indicated by opposing counsel, did testify. And to me, there's no reason why he could have not testified of what trail he believed was used and where the shrine was arguably located. Even if you couldn't use Jemez's exact map, you could have made your own map to do that. And I will say that, you know, there were dozens of Jemez witnesses that were talking about the Shrine Lands. This was very clear over this very long trial that this was important to Jemez, and this is why they're bringing that case. So I think it's disingenuous to try to assert that somehow that was not a focus of trial. And if Judge Moritz would like me to, I'd try to point to the couple of questions you had in terms of discovery. But I don't know. I think the government answered one of them, so that's fine. That's all right. Okay. If you want to submit a 28-J or something, that's fine too. Okay. And one other issue I'd like to just point out briefly is that the district court found that the deed, and this court also found in Jemez 1, that the deed from the Bacchus to the government specifically excluded from its warranty claims by Indians. But Jemez was the only tribe to bring a claim. No other tribe sought to intervene or assert any type of claim. And so to me the government is arguing common tribal interests, not to protect other tribes, but really to try to protect the U.S.'s own interests. I think that's it. Unless there's other questions, that's all I have. Thank you very much. Thank you, counsel. The case is submitted.